UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Criminal No. 4:21-CR-140 |
| v. ) | |
| ) | INFORMATION |
| LARRY CHARLES HENSON, ) | |
| ) | T. 18 U.S.C. § 1349 |
| Defendant. ) | |

THE UNITED STATES ATTORNEY CHARGES:

### COUNT ONE
**(Conspiracy to Commit Wire Fraud Affecting a Financial Institution)**
**[Title 18, United States Code, Section 1349]**

#### Introductory Allegations

At all times relevant to this Information:

1. **LARRY CHARLES HENSON** ("Defendant") was a resident of Davenport, Iowa, and the President and Chairman of Valley Bank in Moline, Illinois. Valley Bank was wholly-owned by River Valley Bancorp, Inc., a multi-bank holding company, regulated by the Board of Governors of the Federal Reserve System. Defendant also served as the President, Chief Executive Officer, and Chairman of River Valley Bancorp, Inc.

2. Valley Bank was a financial institution as defined under Title 18, United States Codes, Sections 20 and 3293(2). Customer accounts at Valley Bank were insured by the Federal Deposit Insurance Corporation.

3. The U.S. Small Business Administration ("SBA") was a federal agency that administered a loan program (the "7(a) loan program") through which the SBA provided guarantees to loans made by banks to qualifying small businesses. An SBA guarantee meant that

1

the SBA would insure up to 90% of the value of the loan by agreeing to purchase up to 90% of the loan from the holder of the note in the event the borrower defaulted.

4. The SBA's 7(a) loan program encouraged banks to make loans that they otherwise may not have made, because the SBA's guarantee ensured that the bank would be reimbursed for the vast majority of losses if the borrower defaulted. The SBA imposed certain requirements and guidelines on its loan guarantees to ensure that borrowers were creditworthy, that the loan would be used for productive purposes, and that the loan would be repaid. To obtain a guarantee from the SBA, the lender (or its duly authorized agent) was required to submit a guarantee application to the SBA.

5. If a borrower defaulted on an SBA-guaranteed loan, the lending bank would submit a purchase request to the SBA to receive reimbursement for the balance of the loan. The package of documents the lender submitted as part of the purchase request was known as the "10 Tab" and included certifications by the lender that the proceeds of the loan were used as stated on the loan guarantee authorization documents. Only if all program rules and guidelines were met would the SBA actually issue a reimbursement payment to the lender.

6. Company 1 was a lending service provider ("LSP") based in Clive, Iowa. Most of Company 1's clients were small federally-insured lending institutions located in the Midwest. As an LSP, Company 1 packaged, originated, disbursed, serviced, and liquidated loans guaranteed by the SBA on behalf of Company 1's clients. Company 1 assisted banks in obtaining SBA loan guarantees as part of the loan origination process. Valley Bank retained Company 1 to assist in originating SBA loans.

7. The SBA published a guide spelling out its guidelines and rules for originating guaranteed loans, which was known as Standard Operating Procedure ("SOP") 50 10 5. Version D of the SOP 50 10 5, effective on or about September 16, 2011, provided that when a lender was seeking to make an SBA-guaranteed loan to refinance debt a borrower had with the same lender, the lender was required to include a transcript showing when prior payments were due and received. In addition, the lender was required to explain any late payments and late charges that occurred during the preceding 36 months. An SBA-guaranteed loan was not permitted to be used to refinance debt owed to the lender itself where there was an appearance that the lender would shift to the SBA all or part of a potential loss from that same debt.

8. Co-Conspirator 1 was the founder and president of Company 1.

9. ANDREW ROBERT ERPELDING was a vice president and regional manager at Valley Bank.

10. SUSAN CHRISTINE MCLAUGHLIN was vice president of credit administration at Valley Bank.

11. Borrower 1 was a Kentucky-based business that applied to refinance a $5,000,000 loan with an SBA-guaranteed loan from Valley Bank in or about September 2011.

12. Borrower 2 was a Florida-based business that applied to refinance a $4,630,000 loan with an SBA-guaranteed loan from Valley Bank in or about December 2011.

13. Borrower 3 was a Florida-based business that applied to refinance a $5,000,000 loan with an SBA-guaranteed loan from Valley Bank in or about January 2012.

### The Conspiracy

14. Beginning in or about September 2011, and continuing until in or about November 2014, in the Southern District of Iowa, and elsewhere, Defendant,

**LARRY CHARLES HENSON,**

did willfully and knowingly combine, conspire, confederate, and agree with Co-Conspirator 1 and other employees of Company 1, ANDREW ROBERT ERPELDING, SUSAN CHRISTINE MCLAUGHLIN, other employees of Valley Bank, and other persons known and unknown to the United States Attorney to commit the offense of wire fraud affecting a financial institution in violation of Title 18, United States Code, Section 1343, that is, knowingly, and with intent to defraud, intending to devise and having devised a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and, for the purpose of executing such scheme and artifice and attempting to do so, to transmit and cause to be transmitted, certain wire communications in interstate commerce, all affecting a financial institution as defined under Title 18, United States Code, Sections 20 and 3293(2), namely Valley Bank.

### The Purpose of the Conspiracy

15. It was a purpose of the conspiracy that Defendant and his co-conspirators would (a) generate unlawful revenue and fees for their respective employers by fraudulently obtaining SBA loan guarantees and requesting that the SBA honor those guarantees and (b) conceal their scheme from the SBA.

### The Manner and Means of the Conspiracy

The object and purpose of the conspiracy was carried out, in substance, as follows:

16. Defendant, working with other employees of Valley Bank and Company 1, sought to obtain SBA guarantees for loans that did not meet SBA's guidelines and requirements.

17. To ensure the loans appeared to meet SBA guidelines, Defendant and his co-conspirators made false statements on loan guarantee applications and purchase requests sent to the SBA about matters such as a borrower's eligibility to receive a loan and how loan proceeds would be disbursed.

18. The loan guarantee applications and purchase requests containing the false statements were intended to fraudulently induce the SBA to compensate Valley Bank in the event the borrowers on those loans defaulted.

## THE BORROWER 1 LOAN

19. Beginning in or about 2011, Valley Bank attempted to shift the risk of loss on a preexisting loan to Borrower 1 to third parties because Borrower 1 was highly leveraged with debt and had limited collateral. After Valley Bank failed to find investors willing to purchase its preexisting loan to Borrower 1, Valley Bank attempted to refinance the loan through the SBA's 7(a) loan program.

20. On or about September 13, 2011, ERPELDING emailed Defendant, copying Co-Conspirator 1, and stated, "I wanted to follow-up on [Borrower 1] application. [Co-Conspirator 1] and M****** C***** were able to speak at length yesterday and make the necessary tweaks to the financial statements. [Co-Conspirator 1] is incorporating those into the application and preparing the final package for signatures. He is going to send them to me and I will have them by the end of the week … we will get it submitted to the SBA. Please let [Co-Conspirator 1] or me know if you have any questions at this point."

21. On or about September 30, 2011, Defendant sent an email to Co-Conspirator 1 in which he stated, "If a loan goes more than 30 days past due while we are applying for an SBA loan or if it has been more than 30 days past due recently, does that impact our ability to get the guarantee done?" Co-Conspirator 1 responded, "If a loan has been more than 29 days past due when we apply then the loan would not be eligible for refinance. As for after the application is sent but before we close that is a grey area. The borrower must sign a certification that there is no material adverse change in the business since the application. I would do everything possible to make sure the borrower is not more than 29 days late on a payment while applying, including doing a 30/60/90 day payment deferral during the application process."

22. In or about October 2011, Co-Conspirator 1 called Defendant and explained a variety of ways in which he had banks fraudulent hide from the SBA that a loan had been more than 30 days past due, including back dating loan modifications. Co-Conspirator 1 explained that it was important that a bank change its electronic records to match fraudulent loan modifications. Defendant agreed to fraudulently modify loans as instructed by Co-Conspirator 1.

23. In or about October 2011, Valley Bank applied to refinance Borrower 1's $5,000,000 loan through the SBA's 7(a) loans program

24. In or about October 2011, ERPELDING received a phone call from Co-Conspirator 1 that the Borrower 1 loan could not be refinanced through the SBA's 7(a) loan program because of loan's history of past-due payments. Co-Conspirator 1 stated that loans that had payment delinquency more than 30 days past due could not qualify for an SBA guaranty.

25. ERPELDING called Defendant and provided him with the information provided by Co-Conspirator 1. ERPELDING and Defendant jointly called MCLAUGHLIN. ERPELDING

and Defendant explained that Borrower 1 had a history of delinquent payments on the loan, and that MCLAUGHLIN should alter the payment reports.

26. MCLAUGHLIN logged into Valley Bank's system and fraudulently changed Borrower #1's payment history report to remove payment delinquencies. ERPELDING later pulled the loan transcripts in question, and the payment histories falsely reflected that the loans had never been more than 29 days past due, when in fact the loans had been more than 30 days past due.

27. SBA loan documents and transcripts for Borrower 1 were signed by ERPELDING on approximately October 13, 2011 and as part of that process, ERPELDING falsely certified to the SBA that Borrower 1's payments had never been more than 29 days late in the preceding 36 months.

28. On or about October 17, 2011, ERPELDING and Co-Conspirator 1 on behalf of Valley Bank caused the settlement sheet and loan authorization in the name of Borrower #1 containing misrepresentations about the loan payment history to be transmitted via interstate facsimile to the SBA loan processing center in Citrus Heights, California in support of obtaining an SBA-guaranteed loan for Borrower 1.

### *THE BORROWER 2 LOAN*

29. Beginning in or about 2011, Valley Bank attempted to shift the risk of loss on a preexisting loan to Borrower 2 to the SBA by attempting to refinance the loan through the SBA's 7(a) loan program.

30. On or about August 3, 2011, ERPELDING emailed Defendant stating, "[Co-Conspirator 1] has requested that we move the [Borrower 2] loan from a USDA application to a

SBA application... The fee income on this deal should we get it done would be roughly $300,000 after Vital was paid their portion." Defendant replied, "Ok."

31. On or about September 1, 2011, Valley Bank applied to refinance Borrower 2's $4,630,000 loan through the SBA's 7(a) loan program.

32. On or about September 13, 2011, the SBA declined the loan because the borrower was a guarantor on two other SBA loans that were in default in the amount of $484,904.03. Co-Conspirator 1 emailed the SBA on or about September 23, 2011, and requested the withdrawal of Borrower 2's application.

33. On or about September 16, 2011, the guarantor on the Borrower 2 loan emailed Defendant and Co-Conspirator 1 and stated, "I want to take this opportunity to first of all apologize for responding incorrectly to your question to me, 'Have you ever had any other SBA loans that remain unpaid'. As I am sure you could tell when we talked with J*** on the phone with me, I had no recollection of the one occasion when I was involved with the SBA. When J*** mentioned S*** E***** and you indicated that was the company that the SBA had on record for me owing 2 loans totaling $484,000 it began to ring a bell for me."

34. On or about October 4, 2011, ERPELDING emailed Defendant stating, "Medallion has been resubmitted to the SBA under the new ownership group, waiting on a response from the SBA."

35. On or about October 6, 2011, Co-Conspirator 1 submitted a new loan application to the SBA in the name of a business that was an acronym for Borrower 2 in the amount of $4,630,000, when in fact Borrower 2 had never operated under that name. The guarantor on the new application was the spouse of the guarantor on the initial application.

36. On or about October 24, 2011, an SBA Loan Specialist notified ERPELDING that the SBA reviewed the information provided with the new loan guarantee request but could not complete the credit analysis and/or the loan authorization until the SBA received a copy of the Valley Bank notes to be refinanced and payment transcripts for the last 36 months.

37. On or about November 9, 2011, Co-Conspirator 1 copied ERPELDING on an email in which he stated, "We need to rewrite the Valley Bank Notes so they are in the name of [acronym for Borrower #2]. We need to make the Notes current, or provide extensions, as well. Perhaps we can have the due date 3/31/2012?. … Andy needs to provide signed and dated transcripts showing that the payments on the notes to be refinanced have never been more than 29 days past due."

38. On or about November 9, 2011, ERPELDING emailed Co-Conspirator 1 and stated, "All of the notes are current and have been modified to extend the due dates. I need to talk to our administration department to see how we accomplish changing the notes on the system, im not sure that can be done."

39. On or about November 10, 2011, ERPELDING emailed Defendant, copying Co-Conspirator 1 and stating, "I've been talking with J*** and M**** and [Co-Conspirator 1] today concerning the medallion app and have a good solution to our issue and have it in process now."

40. On or about November 10, 2014, Co-Conspirators on behalf of Valley Bank caused the 10 Tab in the name of the acronym of Borrower 2 containing misrepresentations about the payment history to be transmitted via facsimile to the SBA loan processing center in Citrus Heights, California in support of obtaining an SBA-guaranteed loan for the acronym of Borrower 2.

41. On or about November 16, 2011, ERPELDING emailed Defendant stating, "Just as an FYI, I redid the [Borrower 2] notes and we have now submitted the response to the SBA as evidenced below. I am hopeful we will receive a response in the next week or so and can then move to a closing date."

42. The fraudulent loan application was accepted by the SBA and ultimately defaulted. The SBA realized a loss of approximately $2,102,150.19 from its guaranty of this fraudulent loan.

### *THE BORROWER 3 LOAN*

43. Beginning in or about January 2012, Valley Bank attempted to shift the risk of loss on a preexisting loan to Borrower 3 to the SBA by attempting to refinance the loan through the SBA's 7(a) loan program. As part of the application, Borrower 3 requested $1,309,574 in working capital, $3,684,926 to payoff bank loans, and $5,500 for closing costs.

44. On approximately January 11, 2012, ERPELDING forwarded a Personal Financial Statement reviewed by Borrower 3 to Co-Conspirator 1. The Personal Financial Statement showed that Borrower 3 had a net worth of $407,973.

45. On approximately January 30, 2012, Co-Conspirator 1 submitted the Borrower 3 application to the SBA. In support of the loan, Co-Conspirator 1 submitted a Personal Financial Statement that falsely showed that Borrower 3 had a net worth of $2,223,939. The version submitted to the SBA falsely indicated that Borrower 3 had $750,000 in savings accounts and that he had other assets in the amount of $1,000,000 which were not listed on the original Personal Financial Statement.

46. On approximately January 30, 2012, ERPELDING signed an SBA Eligibility Questionnaire for Standard 7(a) Guaranty, certifying that the information contained in the

questionnaire was true and correct to the best of the lender's knowledge and that the lender exercised due diligence to obtain true and correct information. The questionnaire falsely indicated that Borrower 3 was injecting $750,000 into the business and had liquid assets of approximately $780,323.

47. On or about February 6, 2012, SBA sent correspondence to ERPELDING and copied Co-Conspirator 1 stating that the SBA could not complete the credit analysis or the Loan Authorization for the Borrower 3 loan until additional information was provided.

48. On or about March 5, 2012, Co-Conspirator 1 emailed additional information to the SBA in order to continue the loan process. Specifically, Co-Conspirator 1 falsely informed the SBA that Borrower 3 had loaned $750,000 to the business.

49. The SBA ultimately approved the loan to Borrower 3 in the amount of $5,000,000, with a loan condition that at least $750,000 in cash be injected into the business as equity capital. The SBA authorization noted that the lender was required to obtain evidence of the injection prior to disbursement.

50. In truth, Borrower 3's original Personal Financial Statement showing a net worth of $407,973 was accurate, and Borrower 3 did not provide a $750,000 cash injection as indicated on forms submitted by Co-Conspirator 1 to the SBA.

51. The SBA loan to Borrower 3 ultimately defaulted and SBA realized a loss of approximately $2,426,041.07 from its guaranty of the loan.

All of which is in violation of Title 18, United States Code, Section 1349.

| | |
|---|---|
| JOSEPH S. BEEMSTERBOER<br>Acting Chief, Fraud Section<br>Criminal Division<br>U.S. Department of Justice | RICHARD D. WESTPHAL<br>Acting United States Attorney<br>Southern District of Iowa |
| *signature* 11/9/21<br>Siji Moore<br>Trial Attorney, Fraud Section<br>Babasijibomi.Moore2@usdoj.gov<br>1400 New York Ave, N.W.<br>Washington, D.C. 20005<br>Tel: 202-834-2793 | *signature* 11/9/2021<br>Adam J. Kerndt<br>Assistant United States Attorney<br>Adam.Kerndt@usdoj.gov<br>U.S. Courthouse Annex<br>110 East Court Avenue, Suite 286<br>Des Moines, IA 50309<br>Tel: (515) 473-9300<br>Fax: (515) 473-9292 |